1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   WILLIAM BARKER,                           No.  2:11-cv-00246 KJM AC P

12                  Plaintiff,

13          v.                                  FINDINGS AND RECOMMENDATIONS

14   R. YASSINE,

15                  Defendant.

16

17   I.  Introduction

18          Plaintiff William Barker is a state prisoner proceeding in forma pauperis, ECF No. 7, with

19   counsel, ECF No. 53, in this civil rights action filed pursuant to 42 U.S.C. § 1983.  This action

20   proceeds on plaintiff's First Amended Complaint (FAC) filed October 15, 2012.  See ECF No.

21   72-1.  By order filed September 27, 2013, all of plaintiff's claims were dismissed with the

22   exception of his Eighth Amendment excessive force claim against sole defendant Correctional

23   Officer R. Yassine.[1]  See ECF No. 89, Order adopting Findings and Recommendations filed May

24   7, 2013, ECF No. 85.  Plaintiff claims that, on October 25, 2009, at a prison security checkpoint,

25   _____

26   [1]  Although plaintiff's proposed Second Amended Complaint, ECF No. 80-1, was examined to
     analyze the merits of defendant's 2013 motion to dismiss, see ECF No. 85 at 3 n.1, this action
     continues to proceed on the First Amended Complaint, ECF No. 72-1.  See ECF No. 85 at 18
27   ("The action proceeds only on plaintiff's Eighth Amendment claim against defendant Yassine
     (ECF No. 72-1 at ¶¶ 68-74.")); see also ECF No. 73 at 2.
28

                                              1

1  defendant used excessive force to attempt a search of plaintiff, who was in a wheelchair, resulting

2  in injury.  Plaintiff seeks monetary damages, and attorney fees and costs.

3      Pending before the court is defendant's motion for summary judgment.  ECF No. 112.

4  Plaintiff filed an opposition, ECF No. 113, and defendant replied, ECF No. 114.  This matter was

5  heard before the undersigned on February 28, 2015.  Attorneys Scottlynn Hubbard and Stephanie

6  Ross appeared on behalf of plaintiff; defendant was represented by Martin Kosla.  Following the

7  hearing, plaintiff was permitted to submit additional briefing and medical evidence, ECF No. 117,

8  and defendant was permitted to submit the report and curriculum vitae of his expert witness, ECF

9  No. 116.

10      Defendant moves for summary judgment on the ground that plaintiff has failed to

11  establish a relevant material factual dispute that overrides the reasonable inference, based on all

12  the evidence, that defendant's use of force was appropriate and exercised without a culpable state

13  of mind.  On these grounds, defendant also contends that he is entitled to qualified immunity.

14  II.  Legal Standards

15      A.  Motion for Summary Judgment Under Federal Rule of Civil Procedure 56

16      Summary judgment is appropriate when the moving party "shows that there is no genuine

17  dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

18  Civ. P. 56(a).  Under summary judgment practice, the moving party "initially bears the burden of

19  proving the absence of a genuine issue of material fact."  In re Oracle Corp. Securities Litigation,

20  627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

21  The moving party may accomplish this by "citing to particular parts of materials in the record,

22  including depositions, documents, electronically stored information, affidavits or declarations,

23  stipulations (including those made for purposes of the motion only), admission, interrogatory

24  answers, or other materials" or by showing that such materials "do not establish the absence or

25  presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to

26  support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).

27      When the non-moving party bears the burden of proof at trial, "the moving party need

28  only prove that there is an absence of evidence to support the nonmoving party's case."  Oracle

1   Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B).

2   Indeed, summary judgment should be entered, after adequate time for discovery and upon motion,

3   against a party who fails to make a showing sufficient to establish the existence of an element

4   essential to that party's case, and on which that party will bear the burden of proof at trial.  See

5   Celotex, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the

6   nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a

7   circumstance, summary judgment should be granted, "so long as whatever is before the district

8   court demonstrates that the standard for entry of summary judgment . . . is satisfied."  Id. at 323.

9        If the moving party meets its initial responsibility, the burden then shifts to the opposing

10   party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita

11   Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

12   existence of this factual dispute, the opposing party may not rely upon the allegations or denials

13   of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

14   admissible discovery material, in support of its contention that the dispute exists.  See Fed. R.

15   Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the

16   fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

17   governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,

18   Inc. v. Pacific Elec. Contractors Assoc., 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

19   genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

20   party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

21        In the endeavor to establish the existence of a factual dispute, the opposing party need not

22   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

23   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

24   trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

25   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

26   Matsushita, 475 U.S. at 587 (citations omitted).

27        "In evaluating the evidence to determine whether there is a genuine issue of fact," the

28   court draws "all reasonable inferences supported by the evidence in favor of the non-moving

3

party."  <u>Walls v. Central Costa County Transit Authority</u>, 653 F.3d 963, 966 (9th Cir. 2011).  It is

the opposing party's obligation to produce a factual predicate from which the inference may be

drawn.  <u>See</u> <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985),

aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

party "must do more than simply show that there is some metaphysical doubt as to the material

facts . . . .Where the record taken as a whole could not lead a rational trier of fact to find for the

nonmoving party, there is no 'genuine issue for trial.'"  <u>Matsushita</u>, 475 U.S. at 587 (citation

omitted).

    B.  <u>Excessive Force within the Prison Context</u>[2]

    "In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places

restraints on prison officials, who may not . . . use excessive physical force against prisoners."

<u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994) (citing <u>Hudson v. McMillian</u>, 503 U.S. 1 (1992)).

---

[2]  In addition to these legal standards, which govern the constitutional issue, the parties agree that the California Department of Corrections and Rehabilitation (CDCR) regulations provide the following definitions and parameters:

    • Obeying Orders:  "Inmates and parolees must promptly and courteously obey written and verbal orders and instructions from department staff . . . ."  15 C.C.R. § 3005(b).

    • Use of Force.  "Reasonable Force:  The force that an objective, trained and competent correctional employee, faced with similar facts and circumstances, would consider necessary and reasonable to subdue an attacker, overcome resistance, effect custody, or gain compliance with a lawful order ."  15 C.C.R. §3268(a)(1).

    • Use of Force.  "Excessive Force:  The use of more force than is objectively reasonable to accomplish a lawful purpose."  15 C.C.R. §3268(a)(3).

    • Use of Force.  "Immediate Use of Force:  The force used to respond without delay to a situation or circumstance that constitutes an imminent threat to security or the safety of persons."  15 C.C.R. §3268(a)(4).

    • Use of Force.  "Use of Force Options:  . . . The unresisted searching or escorting of a person and the unresisted application of authorized restraint equipment is not a use of force." 15 C.C.R. §3268(c).

    • Use of Force.  "Reporting Requirements:  Every staff use of force is an incident that shall be reported."  15 C.C.R. §3268.1(a).

1  "[W]henever prison officials stand accused of using excessive physical force in violation of the

2  [Eighth Amendment], the core judicial inquiry is . . . whether force was applied in a good-faith

3  effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson,

4  503 U.S. at 6-7 (citing Whitley v. Albers, 475 U.S. 312 (1986)).

5       When determining whether the force was excessive, we look to the "extent of the injury . .

6  . , the need for application of force, the relationship between that need and the amount of force

7  used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to

8  temper the severity of a forceful response.'" Hudson, 503 U.S. at 7 (citing Whitley, 475 U.S. at

9  321). While de minimis uses of physical force generally do not implicate the Eighth Amendment,

10 significant injury need not be evident in the context of an excessive force claim, because "[w]hen

11 prison officials maliciously and sadistically use force to cause harm, contemporary standards of

12 decency always are violated." Hudson, at 9 (citing Whitley, at 327).

13      "The extent of injury may . . . provide some indication of the amount of force applied. . . .

14 [N]ot 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" Wilkins

15 v. Gaddy, 559 U.S. 34, 37 (2010) (quoting Hudson, 503 U.S. at 9). "The Eighth Amendment's

16 prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional

17 recognition de minimis uses of physical force, provided that the use of force is not of a sort

18 repugnant to the conscience of mankind. An inmate who complains of a 'push or shove' that

19 causes no discernible injury almost certainly fails to state a valid excessive force claim. [¶]

20 Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately

21 counts." Wilkins, 559 U.S. at 37-8 (citations and internal quotation marks omitted).

22      C.  Qualified Immunity

23      Government officials are immune from civil damages "unless their conduct violates

24 'clearly established statutory or constitutional rights of which a reasonable person would have

25 known.'" Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457

26 U.S. 800, 818 (1982)). In analyzing a qualified immunity defense, the court must consider the

27 following:  (1) whether the alleged facts, taken in the light most favorable to the plaintiff,

28 demonstrate that defendant's conduct violated a statutory or constitutional right; and (2) whether

the right at issue was clearly established at the time of the incident.  Saucier v. Katz, 533 U.S.

194, 201 (2001).  These questions may be addressed in the order most appropriate to "the

circumstances in the particular case at hand."  Pearson v. Callahan, 555 U.S. 223, 236 (2009).

Thus, if a court decides that plaintiff's allegations do not support a statutory or constitutional

violation, "there is no necessity for further inquiries concerning qualified immunity."  Saucier,

533 U.S. at 201.  On the other hand, if a court determines that the right at issue was not clearly

established at the time of the defendant's alleged misconduct, the court need not determine

whether plaintiff's allegations support a statutory or constitutional violation.  Pearson, 555 U.S. at

236-242.

III.  Factual Record[3]

    A. Undisputed Facts

The parties agree that the following facts are undisputed, or the record before the court so

demonstrates.  (Disputed facts are noted summarily to provide context to the disputed facts, and

are set forth in detail below.)

    • Plaintiff William Barker has been incarcerated in the custody of CDCR since June 24,

2004.  Plaintiff was housed at the California Medical Facility (CMF) on October 25, 2009 when

the incident underlying this action occurred.

    • Defendant R. Yassine is employed by CDCR as a Correctional Officer (CO).  On

October 25, 2009, defendant was on duty as the only CO stationed during third watch (2:00 p.m.

to 10:00 p.m.) at CMF's Unit I Grill Gate ("the Gate"), a security checkpoint between the yard

and the Facility C housing units and B-1 medical clinic.

    • There are signs on both sides of the Gate which state:  "Inmates' Notice: No ID Card,

No Entrance, and No Exit."  When inmates pass through the Gate, they must show their inmate

_____

[3]  See Defendants' Statement of Undisputed Facts (DSUF), ECF No. 23-2 at 1-4 and attached
exhibits; Plaintiff's Response to DSUF (Pl. Rsps.), ECF No. 113-1 at 1-22; Plaintiff's Statement
of Disputed Facts (PSDF), ECF No. 113-2 at 1-6 and attached exhibits; and Defendant's Replies
(Df. Reply), ECF Nos. 114-1 and 114-2; see also plaintiff's supplemental medical evidence (Pl.
Med. Supp.), ECF No. 117; and defendant's supplemental declaration with the declaration, report
and curriculum vitae of defendant's expert witness (Df.'s Exp. Supp.), ECF No. 116.

1    I.D. to the CO on duty.

2         • On October 25, 2009, plaintiff passed through the Gate without incident when he left his

3    housing unit for yard release.

4         • Later, at approximately 3:45 p.m., when exiting the yard for yard recall, plaintiff

5    approached the Gate in his wheelchair.  Approximately 100 to 150 inmates were returning from

6    the yard at this time, and they all needed to pass through the Gate.

7         • As plaintiff passed through the Gate, defendant asked plaintiff to show him his Inmate

8    ID.  (The parties dispute whether plaintiff showed defendant his ID.)

9         • Defendant asked plaintiff to show him his medical ducat (notice of appointment)[4] for

10   the medical clinic.  (The parties dispute whether plaintiff showed defendant any portion of his

11   medical ducat.)

12        • Defendant ordered plaintiff to face the wall and submit to a search.  Defendant searched

13   plaintiff's shoulders and upper back but was unable to continue the search because plaintiff

14   refused to lean further forward.  Defendant activated his alarm to receive the assistance of other

15   officers.  When the alarm was cleared, plaintiff was escorted to his scheduled appointment at the

16   medical clinic.

17        • On November 2, 2009, defendant submitted an RVR about the incident, premised on

18   "Disobeying a Direct Order."  See ECF No. 112-3 at 85-7 (Df. Ex. G).  Defendant stated therein

19   that plaintiff disobeyed defendant's direct orders "to show his ID," and to "get on the wall and to

20   show [] his B-1 clinic ducat."  Id. at 85.  On January 12, 2010, pursuant to hearing, an internally

21   contradictory decision issued, finding that plaintiff was both "not guilty" and "guilty" of a

22   Division "F" offense for violation of 15 C.C.R. § 3005(b) (see n.2, supra).  ECF No. 112-3 at 86-

23   7.  On April 13, 2010, pursuant to an administrative appeal filed by plaintiff (Log No. CMF-10-

24   M-539), the RVR was dismissed, pursuant to CMF Warden Dickinson contacting the hearing

25   _____

26   [4] "A CDC Form 129 [], Inmate Pass, shall be issued to an inmate approved for movement to a
     scheduled non-routine appointment."  15 C.C.R. § 3274(b)(1) ("Appointments").  Defendant
27   states that a ducat informs correctional officers that an inmate has been given permission to leave
     his assigned housing unit and enter the medical clinic.  ECF No. 112-3 at 5, Df. Decl. ¶ 5.

28

1    officer who stated that "the disposition portion of the RVR was in error as he had found the

2    appellant not guilty."  See ECF No. 113-3 at 9-10 (Pl. Ex. B).

3         • Plaintiff pursued an administrative appeal against defendant Yassine, alleging excessive

4    force, which was exhausted at the Third Level on January 5, 2011, and affirmed the Second Level

5    decision "that staff did not violate CDCR policy with respect to the issues raised."  See ECF No.

6    1 at 12-14.

7         • Prior to this incident, on March 10, 2009, a bottle containing methadone was found

8    underneath plaintiff's wheelchair cushion.  The discovery was made incident to a clothed body

9    search of plaintiff on an ADA bench and a separate search of his wheelchair.  See ECF No. 112-3

10   at 90, 93, 105; see generally ECF No. 112-3 (Df. Ex. H).  An RVR was prepared on April 22,

11   2009, after receipt of the toxicology results, id. at 89-94, 101, and resolution pending referral of

12   the matter to the District Attorney for prosecution, id. at 112-13.  At plaintiff's arraignment, the

13   District Attorney requested and obtained dismissal of the charge that plaintiff violated California

14   Penal Code section 4573.6(a).  Id. at 111.  Thereafter, at CMF, based on a finding of guilt for a

15   "first offense" of possessing a controlled substance, plaintiff was assigned to mandatory drug

16   testing for a period of one year.  Id. at 114; see also Pl. Dep. at 73:10-11 (conceding that he was

17   found guilty of the RVR).[5]

18        B.  Disputed Facts

19        The parties dispute their interaction on October 25, 2009 as follows.

20        1.  Plaintiff's Account of the Incident[6]

21        • Plaintiff alleges that "CMF physicians have diagnosed [him] with having a history of

22   chronic infectious disease and a right femur fracture with open reduction and internal fixation[,]

---

[5]  Defendant does not assert that he was aware of this incident before his interaction with plaintiff on October 25, 2009, but relies on it to demonstrate how drug contraband may be concealed in a wheelchair.  Plaintiff testified that he had a prescription for the methadone confiscated in this incident.  Pl. Dep. at 73:5-74:2.

[6]  Plaintiff's Statement of Disputed Facts (PSDF) cites almost exclusively to the FAC (by page, not paragraph, number) and to plaintiff's deposition.  See ECF No. 113-2 at 2-6.  Plaintiff has not filed a declaration.  The undersigned recounts plaintiff's account of the incident as set forth in his sworn deposition, unless otherwise noted.

[causing] . . . pain in his back, shoulder and neck. . . . FAC at ¶ 2; <u>see</u> <u>also</u> ECF No. 1 at 21 (One-Year Medical Chrono valid May 26, 2009 through May 25, 2010), which provides in part:[7]

> The patient has a diagnosis of right hip fracture status post internal fixation.   This is a renewal of his prior chrono.   The patient continues to have chronic right hip pain for which he is being evaluated at an outside orthopedic department.   He also has ongoing low back pain with mild degenerative disk disease of the lumbar spine.   MRI studies of the lumbosacral spine showed mild degenerative disk disease between L5 and S-1.   [¶]   In an 8-hour day he is unable to stand and ambulate except for a short distance with a cane, to go to the restroom.   He is unable to sit for more than 20 minutes due to hip and low back pain, and patient reports that he has to lay down to relieve the pain.

• Plaintiff states that he is designated "DPO" under the <u>Armstrong</u> Consent Decree, as an inmate who does not require a wheelchair fulltime, but is medically prescribed a wheelchair for use outside his cell.   The DPO designation entitles [plaintiff] to a lower bunk and wheelchair-accessible paths of travel."   FAC at ¶ 3; <u>see</u> <u>also</u> ECF No. 113-3 at 6 (Pl. Ex. A) (excerpts from Jan. 3, 2001 Court-Ordered Remedial Plan concerning disabled prisoners and parolees in <u>Armstrong v. Davis</u>, 275 F.3d 849 (9th Cir. 2001)).

• On October 25, 2009, at approximately 3:45 p.m., plaintiff was in his wheelchair returning from the yard, and was pushed by another inmate through the Gate.   When plaintiff got to defendant's post, plaintiff had his ID and ducat out and showed defendant his ID.   Pl. Dep. at 32:15-22.

• Defendant asked plaintiff what the ducat was for.   Plaintiff responded by putting the ducat in his pocket and "told [defendant ] that he was custody and that my medical issues didn't

---

[7]   Plaintiff has submitted no authenticated evidence in support of his medical or physical condition either before or after the incident underlying this action.   Plaintiff did include some medical evidence as exhibits to his original verified complaint, <u>see</u> <u>generally</u> attachments to ECF No. 1, and also submitted additional medical records after the hearing, <u>see</u> ECF No. 117. However, none of these records are authenticated.   <u>See</u> Fed. R. Evid. 901 (methods of authentication).   Hence, this evidence cannot be relied on for definitive findings about plaintiff's medical or physical condition.   Nevertheless, to the extent that this evidence is consistent with plaintiff's testimony, e.g. that he complained of specific medical problems on specific dates, the evidence is within plaintiff's personal knowledge and therefore admissible.   <u>See</u> <u>Jones v. Blanas</u>, 393 F.3d 918, 922 (9th Cir. 2004) (pro se allegation based on personal knowledge is admissible evidence).   Therefore, this court summarizes plaintiff's submitted medical evidence to the extent it is consistent with plaintiff's deposition testimony.

have anything to do with him." Id. at 32:23-33:1.  Defendant was "upset" because plaintiff refused to show him his ducat.  Id. at 33:22-4; 60:2-5, 19-24; 67:2-12.

• Defendant told plaintiff to come back because he was past defendant's post.  The inmate who was pushing plaintiff left and plaintiff rolled himself back to defendant's post.  Id. at 33:2-4.

• Defendant "let a lot of people come by and as they were coming by he was reaching taking different stuff off my wheelchair tossing it on the ground." Id. at 33:5-7.  Plaintiff asked for a sergeant or lieutenant but defendant declined.  Plaintiff testified that defendant "was in front of me reaching, looking on both sides of me, and then he went around me and he said, 'Lean forward.'" Id. at 33:11-4.

• Plaintiff states that he "leaned forward as far as I could with my elbows on my wheelchair cushions" and "told him I couldn't go any farther." Id. at 33:15-8.  "[H]e was trying to see further down my back." Id. at 34:17.  Defendant pushed or shoved the middle of plaintiff's back, causing plaintiff's back to "pop out."  Plaintiff yelled at defendant "that he had popped my back out."  By that time, defendant had activated his alarm.  Id. at 33:17-8; 40:8-16; 63:19-22. Plaintiff contends that defendant hit his alarm to cover up for injuring plaintiff, and by then asserting to the responding officers that plaintiff was being disruptive.  Id. at 40:11-6; 63:9-11; 66:24-5.

• Plaintiff has submitted a copy of a handwritten statement written by CO G. Santos on November 22, 2009, concerning the October 25, 2009 incident, apparently submitted in response to plaintiff's administrative appeal (Log No. CMF-10-M-539).  See ECF No. 113-3 at 12 (Pl. Ex. B).  The statement provides in full, id.:

> On 10.25.09 I/M Barker [#] was escorted to B1 for breathing tx and back problems @ approx. 1600.  I/M Barker relayed to me that he needed to see the doctor because his back was out from being searched at Grill Gate I.  @ that time I had to out count I/M Barker for the 16:30 count because he was waiting to be seen by Dr. Sanders and needed his breathing tx.

• Plaintiff contends that defendant should have used an "ADA compliance bench" to search plaintiff rather than order plaintiff to lean forward in his wheelchair.  PSDF 49-50. Plaintiff cites the Armstrong Remedial Plan, which provides in pertinent part:

10

> Inmates who have a disability that prevents the employment of standard search methods shall be afforded reasonable accommodation under the direction of the supervisor in charge. Such searches shall be thorough and professional, with safety and security being the paramount concern.
>
> Inmates who use wheelchairs and who have severe mobility impairments and are unable to perform standard unclothed body search maneuvers shall be afforded reasonable accommodation to ensure a thorough search, including body cavities. . . .

ECF No. 113-3 at 7 (Pl. Ex. A) (excerpts from Jan. 3, 2001 Armstrong Remedial Plan).

• Plaintiff testified that "prior to [defendant] even starting to search me I asked him to take me to B-1 or someplace where I can get out of this chair without him having to put his hands on me." Pl. Dep. at 33:18-21. Plaintiff stated that "[t]he protocol is you take me someplace where you can remove me out of this chair if you want to see what's behind this chair, and then you search it." Id. at 68:21-3. Plaintiff emphasized that "[defendant] should have taken me someplace that I could have transferred myself out of this wheelchair where he wouldn't have to be pushing and prodding on me to see whatever he claimed he was trying to see behind my back or whatever." Id. at 79:13-7.

• At the medical clinic, plaintiff was given a shot for his back pain and given a "medical lay-in;" plaintiff testified that "it took me quite a while to get back to where my pain level was back to where it normally is very day." Id. at 68:7-11.

• Prior to this incident, plaintiff's treatment for his chronic back pain, and for a recent left shoulder injury due to a fall, included prescriptions for methadone, gabapentin, baclofen muscle relaxers, physical therapy, and pain management. Id. at 47:3-9, 47:22-48:8. After the incident, plaintiff "had to continue to be seen by the doctors," his methadone was increased, and he "think[s] some of [his] other meds [were] increased as well." Id. at 47:10-8; 48:9-13. Asked if his medications were increased due to the incident, plaintiff responded, "It was due to me having continued back pain, and it was related to when I first fell as well as when I got aggravated when he searched me." Id. at 47:21-3.

• Plaintiff's medical records submitted after the hearing in this matter reflect that, on October 26, 2009 (the day after the incident), and again on October 28, 2009, plaintiff was

1   prescribed an ice pack, on the latter date for a period of three days.  ECF No. 117-1 at 1, 4.  From

2   October 31, 2009 until November 4, 2012, plaintiff declined his routine breathing treatments due

3   to back pain.  Id. at 2-3, 5-6, 8-11.  On November 9, 2009, plaintiff was seen for complaints of

4   right hip pain.  Id. at 7.

5          • Plaintiff concedes that defendant "had a right to search my wheelchair, but he didn't

6   have right to push and prod me to search it. . . . [H]e also had a duty . . . to take me someplace

7   where he could search my wheelchair without injuring me as a disabled person."  Id. at 74:14-9.

8          2. Defendant's Account of the Incident

9          • Defendant recalls plaintiff passing through the Gate on the way to the yard ("yard

10  release"), and showing defendant his ID without incident.  Df. Dep. at 52:10-53:1. 53:22-54:9;

11  55:5-18.  Defendant did not know or recognize plaintiff.  Df. Decl. ¶ 7.

12         • Later, at "yard recall," plaintiff again passed through the Gate in his wheelchair; this

13  time defendant asked him to show his ID.  Df. Dep. at 55:19-25; 58:3-15; Df. Decl. ¶ 7.

14         • Plaintiff refused to show his ID and stated "that he did not need to show [defendant] his

15  Inmate ID every time he went through the Gate and that he was going to the B-1 medical clinic."

16  Plaintiff "then continued to go through the Gate in his wheelchair, simultaneously cursing and

17  bad mouthing [defendant]."  Df. Decl. at ¶¶ 8-9; Df. Dep. at 58:3-15.

18         • Defendant asked plaintiff to stop and identify himself, and to show defendant his

19  medical ducat.  Plaintiff "again refused and stated in a loud and hostile voice that he did not have

20  to show me my ducat because this was a medical issue and that I was 'the fucking gate officer' so

21  I should get my 'ass back on the gate.'"  Df. Decl. at ¶ 11; Df. Dep. at 60:16-9.

22         • Defendant gave plaintiff a direct order to move his wheelchair to the wall, but plaintiff

23  refused.  Id. at ¶ 12.  Defendant "gave [plaintiff ] an order to be searched . . . .[a]nd I instructed

24  him to face the wall to be searched."  Df. Dep. at 58:18-21.

25         • Defendant believed, based on his experience as a correctional officer, that "it is not

26  uncommon for inmates in wheelchairs to carry contraband, such as drugs or weapons, in their

27  wheelchairs.  Wheelchairs allow inmates to conceal contraband from correctional staff, especially

28  when moving from one secure area to another at the prison."  Df. Decl. at ¶ 13.

1   • Defendant suspected that plaintiff may be carrying contraband because he "was

2   attempting to get through the Unit I Grill Gate very quickly and without stopping for the security

3   check." Id. at ¶ 14.

4   • When plaintiff became hostile, defendant suspected that plaintiff may be carrying a

5   weapon that would pose an immediate danger to himself or to other inmates at the Gate. Id. at ¶

6   15; Df. Dep. at 61:6-17.

7   • Before searching plaintiff, defendant secured the grill gate "to protect myself and the

8   inmate," so that it "would be one on one with the inmate, and there wouldn't be any other traffic

9   or mass movement behind me or in front me." Df. Dep. at 58:18-24; 59:2-6.

10   • Defendant told plaintiff that he needed to search him and placed his hand on plaintiff's

11   back "to initiate and inform him that I'm beginning to search his back area." Df. Dep. at 66:1-2.

12   Defendant states that he "gently placed [his] hand on Barker's back and told him that he needed

13   to bend forward. Barker leaned forward slightly and then refused to move any further. Instead,

14   Barker continued to be hostile and aggressive." Df. Decl. at ¶ 16; Df. Dep. at 62:7-8, 65:18-22.

15   • Defendant was able "to search [plaintiff's] shoulder and top area, but I wasn't able to

16   search the bottom area because [plaintiff] wasn't bending forward far enough." Df. Dep. at 66:5-

17   7. Defendant "instructed [plaintiff] that he needed to bend completely forward, that way I can

18   provide a thorough search, and he was refusing and being resistive, and at that time that's when I

19   activated my alarm." Df. Dep. at 65:18-22; 66:17-8; 68:10-7 ("he kind of went back into his

20   upright position; that's being resistive[;] [a]nd disobeying a direct order is being resistive as

21   well"). Defendant was not touching plaintiff when he activated his alarm. Id. at 66:19-23.

22   Defendant recalls that plaintiff stated during the attempted search that he had "back issues" but

23   did not state that he was in pain. Df. Dep. at 67:21-68:9. Defendant does not recall hearing a

24   "pop" sound or any other sound from plaintiff's back. Id. at 81:3-6.

25   • Defendant "hit the alarm in order to have additional correctional staff assist me with the

26   situation and the potential safety threat that Barker was posing." Df. Decl. at ¶17.

27   • After the supervisor cleared the alarm, defendant told plaintiff that he was going to

28   write an RVR concerning plaintiff disobeying a direct order, and plaintiff was escorted to the B-1

1    medical clinic.  Id. at ¶¶ 18, 19.

2          • When plaintiff returned from the medical clinic, he asked defendant to refrain from

3    writing an RVR.  When defendant declined, plaintiff alleged for the first time that he was injured

4    in the incident and had heard a loud "pop" when he was required to lean forward in the

5    wheelchair.  Id. at ¶ 20.

6          • Defendant testified that there was no ADA compliant bench in his "area of

7    responsibility" at the Gate, and so he did not offer to use a bench to search plaintiff.  Defendant

8    explained that "[i]f I would have taken him to the nearest bench I would have violated my

9    procedures of leaving the gate unsecured (sic), so no."  Df. Dep. at 62:19-24.

10         3.  Defendant's Expert

11         Defendant has submitted the declaration of D. Tristan, former CDCR Deputy Director and

12   Chief Deputy Director for CDCR's Institutions, Health Care and Parole Division.  See ECF No.

13   112-3 (Df. Ex. B); see also ECF No. 116, Ex. 1 (and attached Ex. A (Expert's CV), and Ex. B

14   (Expert's Report)).[8]

15         Mr. Tristan states and opines in pertinent part that:

16         • Prison checkpoints are established throughout prisons to maintain control and

17   accountability of inmates.  Tristan Decl. at ¶ 7.

18         • Correctional officers at prison checkpoints are required to properly identify inmates

19   trying to gain access to the prison's medical clinic.  An inmate with an appointment at a clinic is

20   provided with a ducat, or appointment slip, that does not contain any medical information but

21   simply informs the officer that the inmate named in the ducat has an appointment.  Id. at ¶ 12.

22         • Medical clinics are particularly susceptible to breaches of security by inmates gaining

23   unauthorized access.  Id. at ¶¶ 8, 10.  A correctional officer at a prison checkpoint is required to

24   search inmates who exhibit unusual behavior before they are allowed access to the medical clinic.

25   Id. at ¶ 17.

26   _____

    [8]  Plaintiff's challenge to defendant's expert witness, based on the alleged lack of authentication
27   of his expert opinion, see e.g. ECF No. 113-1 at 3, is overruled.  As noted, defendant
     subsequently submitted the necessary supporting documents.  See Df. Exp. Supp., ECF No. 116.
28

1        • On October 25, 2009, defendant Yassine's security duties at the Unit I Gate included

2    preventing inmates from gaining unauthorized access to the prison Medical Clinic.  Id. at ¶ 21.

3        • Based on the circumstances that day as described by defendant, including plaintiff's

4    refusal to identify himself, and plaintiff's loud, obscene and defiant behavior, defendant had

5    reasonable cause to believe that plaintiff had concealed contraband.  Id. at ¶ 24.

6        • A clothed pat-down search is not defined as use-of force.  Id. at ¶ 29 (citing 15 C.C.R.

7    3268(c)).  A routine clothed pat-down search can be performed on an inmate in a wheelchair.

8    Such searches normally begin with the upper part of the inmate's body, then the arms and legs.

9    Id. at ¶ 30.

10        • Defendant used "good correctional judgment in sounding his alarm instead of using

11    force to remove Barker from the area."  Id. at ¶ 35.  A "show of force" by the arrival of other

12    correctional officers in response to defendant's alarm "was all that was necessary to gain Barker's

13    compliance."  Id. at ¶ 34.  "Had force been used to overcome any alleged resistance, Barker

14    would have been documented for resistance requiring the use-of-force."  Instead, Barker received

15    a Rules Violation Report for Disobeying an Order."  Id. at ¶ 33.

16    IV.  Discussion

17        A.  Plaintiff's Threshold Procedural Challenge

18        Plaintiff relies on Jones v. Blanas, supra, 393 F.3d 918, to contend that this court should

19    summarily deny defendant's motion for summary judgment, without reviewing the merits.  See

20    ECF No. 113 at 8-9; ECF No. 117 at 1-2.  Plaintiff asserts that, because the verified allegations of

21    plaintiff's initial pro se pleading and its exhibits survived a motion to dismiss[9], plaintiff has met

22    his burden of demonstrating that material factual disputes preclude summary judgment for

23    defendant.  Plaintiff is incorrect.

24        Unlike a motion to dismiss, wherein the court accepts as true the allegations of the

25    complaint, see Hospital Bldg. Co. v. Rex Hospital Trustees, 425 U.S. 738, 740 (1976); Fed. R.

26

27    [9] The pleading that survived defendant's motion to dismiss was in fact the superseding FAC,
      which was prepared by counsel.

28

15

1  Civ. P. 12(b)(6), the non-moving party on a motion for summary judgment may avoid an adverse

2  judgment only by submitting evidence that demonstrates the existence of a genuine issue of

3  material fact, see Matsushita, supra, 475 U.S. at 586-87; see also Fed. R. Civ. P. 56(c)(1)(A) (on a

4  motion for summary judgment, assertions of fact must be supported by "particular parts of

5  materials in the record, including depositions, documents, electronically stored information,

6  affidavits or declarations, stipulations (including those made for purposes of the motion only),

7  admissions, interrogatory answers, or other materials").  "The very mission of the summary

8  judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there

9  is a genuine need for trial."  Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P.

10  56(e) (requiring that parties "properly support" their assertions of fact).

11     Application of these principles requires that this court rely only on admissible evidence in

12  assessing the merits of defendant's motion.  Jones provides that admissible evidence includes

13  plaintiff's verified statements of fact concerning matters within his personal knowledge.  See

14  Jones, 393 F.3d at 922; see also n.7, supra.  However, Jones does not preclude this court's

15  consideration of defendant's admissible evidence or the merits of defendant's motion for

16  summary judgment.

17     B.  Analysis of Excessive Force Claim

18     Defendant is not entitled to summary judgment if the evidence, viewed in the light most

19  favorable to plaintiff, could support a finding that defendant used more force than necessary in

20  executing his attempted search of plaintiff, causing injury to plaintiff, and that defendant did so

21  with malicious intent to cause plaintiff harm.  Hudson, 503 U.S. at 6-7.

22     The parties do not dispute that defendant had the authority to initiate the subject search of

23  plaintiff.  Notwithstanding plaintiff's repeated contention that defendant should have moved

24  plaintiff to an ADA compliant bench to search both plaintiff and his wheelchair, plaintiff has

25  presented no evidence to refute defendant's deposition testimony that there was no ADA

26  compliant bench in defendant's area of responsibility, and that plaintiff would have been derelict

27  in his duties to leave the Gate area.  Df. Dep. at 62:19-24.  Moreover, according to defendant's

28  undisputed expert report, a routine clothed pat-down search may be performed on an inmate in a

1   wheelchair.  Tristan Decl. at ¶ 28-30, 42.  In any case, violations of CDCR policies, the ADA,

2   and/or the Armstrong consent decree do not necessarily violate the Eighth Amendment.

3           Nor is there any reasonable dispute that plaintiff's behavior justified the search.

4   Notwithstanding the parties' dispute whether plaintiff showed defendant his ID, plaintiff

5   concedes that he refused, at least initially, defendant's order to show his medical ducat, in

6   violation of a direct order and thus in contravention of 15 C.C.R. § 3005(b), and that plaintiff

7   spoke defiantly to defendant.  Defendant was then the only correctional officer responsible for

8   100 to 150 inmates passing through the Gate, and it was his responsibility to maintain control and

9   accountability of each inmate.  Tristan Decl. at ¶¶ 7, 13-6, 19.  Moreover, the Gate, as a security

10  checkpoint between the yard and the medical clinic, was particularly susceptible to breaches of

11  security, particularly the movement of contraband, id. at ¶¶ 8-11, and often involving

12  wheelchairs,[10] id. at ¶ 25.  Plaintiff has submitted no evidence to refute the testimony of

13  defendant and the opinion of his expert that it was reasonable for defendant to infer, and that he

14  did infer, that plaintiff's behavior – being hastily pushed through the Gate, refusing defendant's

15  order to show his ducat, and speaking in a defiant and confrontational manner – was consistent

16  with plaintiff concealing contraband, be it drugs or weapons, that could pose a risk of harm to

17  defendant or others.  There is no evidence to refute defendant's testimony that he believed exigent

18  security concerns required that he undertake an immediate search of plaintiff, and that such belief

19  was reasonable under the circumstances.  See 15 C.C.R. § 3268(a)(4) (immediate use of force);

20  id., § 3268(a)(1) (reasonable force under the circumstances).  As a preliminary safety precaution,

21  defendant secured the Gate before commencing the search to "be one on one with the inmate, and

22  there wouldn't be any other traffic or mass movement behind me or in front me."  Df. Dep. at

23  59:3-4.

24          This evidence supports a finding that defendant commenced the challenged search in a

25  "good-faith effort to maintain or restore discipline," Hudson, 503 U.S. at 7 (excessive force claim

26  —————————————

27  [10]  Plaintiff's prior RVR premised on methadone being concealed in his wheelchair, is not
    relevant to defendant's state of mind during the challenged incident, because defendant was
    unaware of the prior incident.  Cf. Tristan Decl. at ¶ 26.

28

1   requires consideration of defendant's perceived need to use force in light of perceived threat).

2   <u>See also</u> Tristan Decl. at ¶¶ 27-8, 39.  Plaintiff has identified no evidence that supports a rational

3   contrary inference.

4          The evidence of what happened next, viewed in the light most favorable to plaintiff,

5   supports a finding that defendant, shortly after commencing the search and upset in response to

6   plaintiff's failure to bend further forward, pushed or shoved plaintiff's middle back, making it

7   "pop" and causing plaintiff pain.  Plaintiff appears to allege that defendant pushed plaintiff's

8   middle back in a single movement, but with increasing force, and despite plaintiff's complaints of

9   pain and requests that defendant stop.  <u>See</u> PDF Nos. 52-4, ECF No. 113-2 at 3-4.[11]  This

10  evidence supports an inference that defendant continued to push plaintiff's back until it "popped,"

11  despite plaintiff's entreaties to stop due to pain and immobility.  The court will assume for

12  purposes of analysis that plaintiff has identified a triable issue of fact on the issue whether

13  defendant's use of force was "objectively unreasonable" under the circumstances.

14         On summary judgment, the court must determine whether these facts also support a

15  reasonable inference that defendant's alleged use of force was undertaken "maliciously and

16

17  [11]  Plaintiff's Disputed Fact Nos. 52-4 allege the following facts:

18              PDF No. 52:  Yassine – still upset that he refused to disclose private
                medical information – shoved Barker forward in his chair.  Barker
19              cried out in agony, telling Yassine that he suffered from back
                problems that restricted his movements.
20

21              PDF No. 53:  But Yassine ignored his pleas for restraint and,
                instead, forcibly pushed him even further until Barker's back
22              emitted a loud "pop" and he cried out again.

23              PDF No. 54:  Barker was obviously injured.  Only after Barker's
                back popped did Yassine activate his personal alarm to summon
24              other staff.  When custody staff arrived, Yassine pointed to Barker
                and told them that "this inmate is causing a disturbance."

25      In support of these allegations, plaintiff cites the following portions of the record:

26
        1.  FAC at pp. 5-6 (presumably ¶¶ 22-5, 28, reflecting the same allegations);
27      2.  Pl. Dep. at 32:13-34:14, 40:8-18 (same, not asserting more than one push);
        3.  Df. Dep. at 65:14- 67:25 (same, not asserting more than one push).

28

1  sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21 (citation and

2  internal quotation marks omitted). "This standard necessarily involves a more culpable mental

3  state than that required for excessive force claims arising under the Fourth Amendment's

4  unreasonable seizures restriction. For this reason, under the Eighth Amendment, we look for

5  malicious and sadistic force, not merely objectively unreasonable force." Clement v. Gomez, 298

6  F. 3d 898, 903 (9th Cir. 2001) (citing Graham v. Connor, 490 U.S. 386, 398 (1989)).

7      The nature and extent of plaintiff's injury, while not dispositive, must be considered in

8  determining whether the evidence supports a reasonable inference that defendant's alleged use of

9  force was motivated by malicious or sadistic intent. See Hudson, 503 U.S. at 7 (court must

10  consider the "extent of the injury"). Here, plaintiff has presented no evidence demonstrating or

11  suggesting that he sustained an objectively identifiable injury as a result of defendant's conduct.

12  Although plaintiff complained that his back "popped," and he thereafter experienced increased

13  back pain for which he was prescribed increased pain medications and a "medical lay-in," he

14  testified only that "it took [him] quite a while to get back to where [his] pain level was back to

15  where it normally is very day." Pl. Dep. at 68:7-11. The medical evidence submitted after the

16  hearing demonstrates only that plaintiff was prescribed ice packs through October 31, 2009 to

17  treat his back pain; that he continued to complain of back pain through November 4, 2009, and

18  declined his routine breathing treatments during this period due to back pain; but that, by

19  November 9, 2009, plaintiff's primary complaint was right hip pain. See generally ECF No. 117-

20  1.

21      This evidence, together with plaintiff's testimony, supports a reasonable inference that the

22  challenged incident caused plaintiff increased pain for a period of no more than two weeks,

23  without any diagnosed or observable injury. These consequences of defendant's challenged

24  conduct do not support a reasonable inference that the amount of force used by defendant was

25  repugnant to the conscience. See Wilkins, 559 U.S. at 37-8.

26      Also significant is the undisputed evidence that defendant's alleged use of force was brief.

27  Although defendant testified that he could not recall "the amount of seconds or time," Df. Dep. at

28  61:2-3, the entire incident transpired within approximately fifteen minutes, from the time plaintiff

entered the Gate until he was escorted to the medical clinic.  Defendant stopped the search of his

own accord – whether because he heard plaintiff's back "pop" or because he realized he was

causing plaintiff pain or realized the futility of the attempted search – and activated his alarm to

quickly bring other officers to the scene and relinquish control to the sergeant.  This conduct

demonstrates defendant's efforts "to temper the severity of [his own alleged] forceful response,"

Hudson, 503 U.S. at 7, and as concluded by defendant's expert, demonstrates "good correctional

judgment," Tristan Decl. at ¶ 35.

Finally, plaintiff has presented no evidence from which a juror could reasonably infer that

defendant harbored malice against plaintiff.  The circumstantial evidence of defendant's mental

state supports no conclusion stronger than an inference that defendant was "upset" by plaintiff's

failure to produce his medical ducat, and was concerned that plaintiff's behavior presented an

imminent risk of harm to others or to the security of the institution.  It is undisputed that the

parties were unknown to each other prior to this incident.  Moreover, it is not unreasonable for a

correctional officer to attempt to proceed with an exigent search of an inmate despite the inmate's

protests.  In sum, the record evidence does not support a reasonable inference that defendant's

challenged conduct was performed with a malicious or sadistic intent to cause plaintiff harm.

Having carefully considered the factors identified in Hudson and Whitley, the undersigned

concludes that this case illustrates the principle that "'not every [allegedly] malevolent touch by a

prison guard gives rise to a federal cause of action,'" and "[a]n inmate who complains of a 'push

or shove' that causes no discernible injury almost certainly fails to state a valid excessive force

claim." Wilkins, 559 U.S. at 37-8 (citations and internal quotation marks omitted).

For these reasons, and based on all the evidence submitted by the parties, this court finds

that no reasonable juror could conclude that defendant acted with malicious and sadistic intent to

cause plaintiff harm or, therefore, that defendant used excessive force against plaintiff in violation

of the Eighth Amendment.  There being no genuine issue of material fact requiring trial in this

action, defendant's motion for summary judgment should be granted.

C.  Qualified Immunity

Where, as here, the facts do not support the alleged violation of a constitutional right, the

1  court need not reach defendant's qualified immunity defense.  See Saucier v. Katz, supra, 533

2  U.S. at 201.

3  V.  Conclusion

4      For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

5      1.  Defendant's motion for summary judgment, ECF No. 112, be granted; and

6      2.  Judgment be entered for defendant.

7      These findings and recommendations are submitted to the United States District Judge

8  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

9  after being served with these findings and recommendations, any party may file written

10  objections with the court and serve a copy on all parties.  Such a document should be captioned

11  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

12  objections shall be filed and served within fourteen days after service of the objections.  The

13  parties are advised that failure to file objections within the specified time may waive the right to

14  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

15  DATED: March 2, 2015

16   

17  ALLISON CLAIRE
   UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28